AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of California

**FILED**

DEC 21 2016

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook, Inc., 1 Hacker Way, Menlo Park, CA<br>94025. | )<br>)<br>)<br>)<br>) |

Case No.

**'16 MJ 3896**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ **Northern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1542 | Passport Application Fraud |

The application is based on these facts:
See attached Affidavit in Support of Application for Search Warrant, which is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Amanda L. Hawes, Special Agent, NCIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **12/20/2016**

_____
*Judge's signature*

City and state: San Diego California

Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook username Stephanie.locker1 (http://www.facebook.com/stephanie.locker1) that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each username listed in Attachment A:

All activity logs for the account and all other documents showing the user's posts and other Facebook activities for the time period of July 1, 2014 to and including April 1, 2015, to include the following:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers for access to the Target Account, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All photographs and videos uploaded by that username and all photographs and videos uploaded by any user that have that user tagged in them;

(c)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; tags; and information about the user's access and use of Facebook applications;

(d)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(e)     All "check ins" and other location information;

(f)     All IP logs, including all records of the IP addresses that logged into the account;

(g)     All information about the Facebook pages that the account is or was a "fan" of;

(h)     All past and present lists of friends created by the account;

(i)     All records of Facebook searches performed by the account;

(j)     The types of service utilized by the user;

(k)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1542 involving Stephanie LOCKER since July 1, 2014, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Steps taken in furtherance of the scheme to obtain fraudulent documentation that would facilitate Stephanie LOCKER's ability to travel with and adopt a baby and/or child from the Philippines.

(b) Evidence indicating how and when the Facebook account (Target Account) was accessed or used, to determine the chronological and geographic context

3

of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account (Target Account) owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID/username, including records that help reveal the whereabouts of such person(s).

   a. The identity of the person(s) who communicated with the Facebook account (Target Account) or Facebook username of Stephanie LOCKER about matters relating to her trip to the Philippines in or about October 2014 and her efforts to fraudulently take custody of a baby and/or child, including records that help reveal their whereabouts.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USERNAME
Stephanie.locker1
(http://www.facebook.com/stephanie.locker1)
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

Case No. _____

## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A SEARCH WARRANT

I, Amanda L. Hawes, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook username that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A.

2.     I am a Special Agent of the Naval Criminal Investigative Service ("NCIS"), and have been so employed since September 2013. My current assignment is at NCIS Resident Agency ("NCISRA") Miramar, San Diego, California, tasked with investigating felony criminal offenses. I am assigned to a General Crimes billet tasked with investigating a variety of investigations. Prior to my current assignment, I was assigned to the NCISRA Camp Pendleton, California, General Crimes Squad. As a

1  Special Agent of NCIS, your affiant authorized to investigate crimes pertaining to the
2  Uniform Code of Military Justice and Federal Statutes. I am a graduate of the Criminal
3  Investigator Training Program and the Special Agent Basic Training Program located at
4  the Federal Law Enforcement Training Center in Glynco, Georgia. I have also received
5  advanced training in Adult Sexual Assault Investigations, Family Sexual Violence
6  Investigations, Death Investigations, and Crime Scene Processing. I have worked a
7  variety of criminal investigations, including but not limited to fraud, rape and other
8  sexual assaults, child pornography, assault and domestic violence, larceny, death
9  investigations, and communication of threats. I have also worked joint investigations
10 with local and federal law enforcement agencies.

11      3.      The facts in this affidavit come from my personal observations, my training
12 and experience, and information obtained from other agents and witnesses. This
13 affidavit is intended to show merely that there is sufficient probable cause for the
14 requested warrant and does not set forth all of my knowledge about this matter.

15      4.      Based on my training and experience and the facts as set forth in this
16 affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1542 (False
17 Statement In Application For Passport) have been committed by Stephanie Jean
18 LOCKER, U.S. Civilian. There is also probable cause to search the information
19 described in Attachment A for evidence of these crimes and contraband or fruits of these
20 crimes, as described in Attachment B.

21                              **PURPOSE OF AFFIDAVIT**

22      5.      I make this affidavit in support of an application for a search warrant for
23 Facebook, Inc. ("Facebook"), as described in Attachment A, to search the following
24 Uniform Resource Locator ("URL"):www.facebook.com/stephanie.locker1, with user
25 name "Stephanie.locker1," (hereinafter, "Target Account"), used by Stephanie
26 LOCKER, from July 2014 to April 2015, for items that constitutes evidence, fruits and
27 instrumentalities of violations of federal criminal law, namely, 18 U.S.C. § 1542

1   (Passport Application Fraud), as described in Attachment B.

2       6.    The information contained in this affidavit is based on my personal
3   experience and training, consultation with other special agents and other law
4   enforcement officers.  The evidence and information contained herein was developed
5   from interviews with suspects, co-conspirators, queries of law enforcement databases,
6   information gained through the use of consent searches and personal knowledge of the
7   on-going criminal investigation.  Because this affidavit is submitted for the limited
8   purpose of securing a search warrant as described herein, it does not include every fact
9   known to me concerning the investigation.

10   **PROBABLE CAUSE**

11       7.    Based on information gathered by United States' and foreign law
12   enforcement, statements provided by the target individuals and other witnesses with
13   knowledge of these events, and on recovered Facebook evidence, U.S. investigators
14   learned the following relevant information:

15       8.    On or about March 5, 2015, Special Agent ("SA") Joseph WILLIAMS,
16   Diplomatic Security Service ("DSS") Regional Security Office ("RSO"), U.S. Embassy
17   Manila, contacted NCISRA Manila regarding a suspected case of passport fraud
18   involving SSGT LOCKER and Stephanie LOCKER.  SA WILLIAMS reported that
19   Stephanie LOCKER had recently appeared at the U.S. Consulate in Cebu, Philippines
20   and applied for a U.S. Passport for her newborn child.  During the application process,
21   Stephanie LOCKER submitted several documents, including: a Command Sponsorship
22   Letter; a U.S. Passport Application; a photocopy of SSGT LOCKER's USMC
23   identification card; a Common Access Card; birth certificates for SSGT LOCKER and
24   Stephanie LOCKER; a marriage certificate; and a copy of Stephanie LOCKER's
25   passport.  Stephanie LOCKER also submitted a Certificate of Live Birth in the name of
26   Emma Loralee LOCKER (Emma L.), which reflected that the minor was born on
27   September 10, 2014 at the Nasipit Birthing Clinic, Agusan del Norte, Philippines.

1  Stephanie LOCKER also provided a notarized sworn affidavit to the U.S. Consulate in
2  Cebu stating that she had traveled to the Philippines on September 4, 2014, for a
3  vacation.  In the affidavit, Stephanie LOCKER claimed that on September 5, 2014, she
4  sought medical attention due to back pain and, while receiving medical treatment, she
5  discovered she was pregnant.  Stephanie LOCKER claimed her daughter was born five
6  days later.  The U.S. Consulate Officer assisting Stephanie LOCKER advised that
7  Stephanie LOCKER would be required to provide additional documentation and records
8  to establish paternity (e,g. a DNA Test).  The U.S. Consulate Officer then swore
9  Stephanie LOCKER to the application as to its truth.  After being sworn to the
10 application, Stephanie LOCKER left the U.S. Consular Agency and returned to Japan.
11 After Stephanie LOCKER returned to Japan, a U.S. Consulate Officer contacted SSGT
12 LOCKER regarding the passport request.  SSGT LOCKER stated he believed the matter
13 had already been closed and that he had no intention of pursuing a passport request for
14 Emma L. any further.  The U.S. Consulate Office subsequently referred the case to DSS
15 who, in turn, provided the information to NCISRA Manila.  During an April 2015
16 interview with NCIS, Stephanie LOCKER stated in substance that she had abandoned
17 her request for a U.S. Passport when she left the Philippines and returned to Japan
18 without Emma L.

19      9.    On or about March 5, 2015, NCIS SA Brian PLATT met with SA
20 WILLIAMS regarding the suspected passport fraud violations by SSGT LOCKER and
21 Stephanie LOCKER.  SA WILLIAMS provided documents including a U.S. Passport
22 Application for Emma L. and Medical Records in the name of Stephanie LOCKER.

23      10.   On or about March 23, 2015, NCIS Investigators ("Inv.") Roosevelt
24 FELICES and Ralfe BALLICUD, along with Police Chief Inspector Ignacio GAMBA,
25 Deputy Chief, Philippine National Police ("PNP") Regional Criminal Investigation
26 Detection Unit ("CIDU"), responded to the Nasipit Birthing Clinic ("NBC"), Agusan del
27 Norte, Philippines, and interviewed Dr. Sheen URQUIZA, Clinic Manager, NBC.

1   URQUIZA confirmed Jenylin ALVAREZ was employed as a midwife at the NBC.  As

2   background, ALVAREZ signed Emma L.'s Certificate of Live Birth as the Attendant at

3   Birth on September 24, 2014.  URQUIZA confirmed ALVAREZ did not follow proper

4   NBC procedure when she entered Emma L.'s birth into the NBC Delivery Logbook out

5   of chronological order.

6          11.     On or about March 24, 2015, Inv. FELICES and Inv. BALLICUD

7   interviewed Jenylin ALVAREZ, a midwife working for the Barangay Health Unit

8   ("BHU") in Barangay Cubi-Cubi, Nasipit, Agusan del Norte, Philippines.  During the

9   interview, ALVAREZ admitted simulating the birth of Emma L. at the behest of

10  Stephanie LOCKER and a female who accompanied Stephanie LOCKER who identified

11  herself as Jocelyn STONE.[1]  ALVAREZ also admitted she falsified the NBC Delivery

12  Logbook to indicate Emma L.'s birth on September 10, 2014, and Stephanie LOCKER's

13  Pre-Natal Medical Records to support Stephanie LOCKER's U.S. Passport application.

14  In addition, ALVAREZ confirmed that on September 24, 2014, she accompanied

15  Stephanie LOCKER and Emma L. to the Office of the Civil Registrar, Nasipit, Agusan

16  del Norte, Philippines, in order to register the birth of Emma L.   According to

17  ALVAREZ, they were able to register the birth of Emma L. after the child's personal

18  appearance.  ALVAREZ said Stephanie LOCKER was issued a Certificate of Live Birth

19  for Emma L. without incident.

20         12.     As a result of Inv. FELICES and Inv. BALLICUD's investigative findings,

21  the PNP CIDU initiated an investigation and located Emma L. at the home of Lenida

22  MAESTRADO, a Philippine national.   The PNP confirmed MAESTRADO is the

23  mother of Jocelyn STONE (also known as Rubelyn or Ruby STONE) and was caring for

24  ───────────────────
    [1]      According to Stephanie LOCKER, Ruby STONE is Stephanie LOCKER's friend
25  who helped Stephanie LOCKER identify a pregnant Filipina woman who was willing to
    give up her unborn child.   STONE also travelled with Stephanie LOCKER to the
26  Philippines as her companion and translator.

27

Emma L.   According to the PNP, MAESTRADO stated that STONE was sending money to her to support Emma L.'s daily needs.   MAESTRADO was unwilling to answer additional questions by PNP investigators.   The PNP CIDU was also able to identify the biological mother of Emma L. as Charlot Montero MOLINA, a Philippine national.

13.   A search of Facebook.com by NCIS revealed apparent "posts" from a "Harry Stone" and a "Stephanie Locker" on the "MCAS Iwakuni Classifieds and Information" page.   A post from "Stephanie Locker," dated September 2, 2014, states "ISO someone to make a sheet cake for upcoming LINKS for Spouses class September 9. Nothing too fancy smooth top with some nice trim will be used for cake cutting ceremony.   I normally do them but will be in the Philippines for birth of our daughter. Will pay in advance to insure it is taken care of.   Please message me or reply here.   Need to get this locked on before I leave."   A post from "Harry Stone," dated December 25, 2014, states "Merry Christmas... I am asking for your help.   I have recently been given the task of caring an infant child that was abandoned.   If you have any un-used un-expired baby food or formula, baby clothes that would fit a 4-month old girl would be greatly appreciated.   Thank You and God Bless You this Christmas."

14.   SA Kevin JONES confirmed Emma L. was listed as a dependent of SSGT LOCKER via the Department of Defense Person Search ("DPS") database.

15.   On or about April 17, 2015, NCIS Special Agents interviewed Stephanie LOCKER.[2] Stephanie LOCKER provided details and documents pertaining to her fraudulently claiming to be the biological mother of Emma L. and fraudulently applying for Emma L.'s U.S. Passport.   Stephanie LOCKER said once she had the birth

---

[2]   Stephanie LOCKER was interviewed at her residence, specifically in her kitchen, after she invited NCIS agents into her home.   The interview was audio recorded but no Miranda warnings were provided.

certificate, she went to the embassy to get Emma L.'s passport. Stephanie LOCKER admitted to handwriting a false statement indicating she had given birth to Emma L. to facilitate the application process. Stephanie LOCKER said that upon the consulate official advising her that she needed to submit to DNA testing, Stephanie LOCKER said she asked the official what would happen if she did not submit to the testing. Stephanie LOCKER said the official advised her that her application would be destroyed. Stephanie LOCKER said she thought that was the end of the story. After the consulate official informed Stephanie LOCKER of the DNA testing requirement, Stephanie LOCKER told NCIS agents that she spoke with Philippine Attorney, Rema D. ERIGBUAGAS-BURDEOS, and MOLINA.[3]  During the meeting, MOLINA said she would take the DNA test, however, Stephanie LOCKER told her she could not take the test for her because it would be proctored.

16.  Stephanie LOCKER advised NCIS agents that after realizing about the DNA test requirement and the fact that she could not submit to the test, Stephanie LOCKER knew she was not going to be able to bring Emma L. home at that time. Stephanie LOCKER told NCIS agents that because she was stressed about not bringing Emma L. home and was running out of blood pressure medication, she had to return to Japan. Stephanie LOCKER said MAESTRADO agreed to keep Emma L. in hopes they would be able to straighten out the paperwork from Japan. Stephanie LOCKER denied to NCIS agents that she provided MAESTRADO any money to keep Emma L., but Stephanie LOCKER admitted to purchasing Emma L. formula prior to leaving the Philippines. Stephanie LOCKER said she returned to Japan on October 24, 2014 and that STONE returned on the first because it was too expensive to change her tickets. Stephanie LOCKER advised NCIS agents that, prior to leaving the Philippines, she attempted to get all documents drafted by Rema D. ERIGBUAGAS-BURDEOS

---

[3]  Charlot MOLINA is the biological mother of Emma L.

1 notarized. However, Rema D. ERIGBUAGAS-BURDEOS refused to notarize the

2 documents, stating the documents were not legal. Rema D. ERIGBUAGAS-BURDEOS

3 subsequently refused to give the originals back to Stephanie LOCKER or STONE.

4     17. During her interview, Stephanie LOCKER provided NCIS agents details

5 and documents concerning her interactions with various individuals in the Philippines,

6 and consented to the searches of her email and Facebook.com accounts. During the

7 interview, Stephanie LOCKER did not provide a clear, concise or chronological account

8 as to sequence of events leading up to her obtaining a fraudulent birth certificate for

9 Emma L. However, Stephanie LOCKER admitted to signing a birth certificate and U.S.

10 Passport application, which included false information, including that Stephanie

11 LOCKER and SSGT LOCKER were the biological parents of Emma L. Stephanie

12 LOCKER told NCIS agents that she began corresponding with Charlot MOLINA about

13 adopting her baby. In addition to speaking with MOLINA, Stephanie LOCKER also

14 corresponded with MOLINA's close friend, Katherine PLAZA.[4] Stephanie LOCKER

15 advised NCIS agents that all communication with MOLINA and PLAZA was conducted

16 via Facebook messenger and Facebook phone. Stephanie LOCKER further provided

17 NCIS with full access to her Facebook account and email account, advising NCIS agents

18 that her conversations with PLAZA and MOLINA were still available via Facebook

19 Messenger.

20     18. On or about April 17, 2015, NCIS agents interviewed SSGT LOCKER who

21 admitted that he was aware that his wife, Stephanie LOCKER, had falsely claimed to be

22 the biological mother of EMMA L. while she was applying for Emma L.'s U.S. Passport.

23   [4]    Katherine PLAZA was identified as MOLINA's best friend and an employee of M-

24 merald birthstone (Jean GONZALES). GONZALES and PLAZA communicated with

25 Stephanie LOCKER about obtaining guardianship and documentation that would allow
Stephanie LOCKER to "adopt" Emma L.

26

27

1   SSGT LOCKER also admitted to signing and submitting documents in furtherance of
2   Emma L.'s passport application, and in furtherance of adding Emma L. as a dependent.

3       19.    On or about April 17, 2015, Stephanie LOCKER provided NCIS SA
4   Teresita BERG authorization to review her personal Facebook Messenger Conversations
5   with persons involved in this investigation.   Utilizing the Facebook username and
6   password provided by Stephanie LOCKER, SA BERG accessed Stephanie LOCKER's
7   Facebook account and located Facebook Messenger conversations between Stephanie
8   LOCKER and the following individuals: SSGT LOCKER, STONE, MOLINA, PLAZA,
9   M-merald Birthstone (Jean GONZALES) and Crystal WHITEKER.[5]   SA BERG
10  reviewed all of the Facebook Messenger conversations Stephanie LOCKER had with the
11  aforementioned parties. The conversations identify Stephanie LOCKER's intentions to
12  obtain fraudulent documentation that would facilitate her ability to travel with and adopt
13  Emma L.

14      20.    On or about March 29, 2016, NCIS agents conducted another interview of
15  Stephanie LOCKER.  During the second interview, agents advised Stephanie LOCKER
16  that after she provided consent, SA BERG accessed and reviewed her Facebook account.
17  SA BERG informed Stephanie LOCKER that her Facebook messages indicated that she
18  had developed plans or ideas as to how to illegally adopt Emma L. *prior* to travelling to
19  the Philippines.  SA BERG presented Stephanie LOCKER with the Facebook messages
20  she exchanged with MOLINA, PLAZA, STONE, and "Jean."  SA BERG showed
21  Stephanie LOCKER Facebook messages dated July 9, 2014, which mentioned Stephanie
22  LOCKER's plans to list SSGT LOCKER as the biological father.  SA BERG also
23  showed Stephanie LOCKER Facebook messages dated August 21, 2014, which

24  ---
    [5]    Crystal WHITEKER is the dependent wife of SSGT LOCKER's Commanding
25  Officer, Lieutenant Colonel ("LtCol") J. WHITEKER. Stephanie LOCKER informed SA
    BERG that she informed WHITEKER and LtCol WHITEKER of "everything"
26  surrounding her attempt to adopt Emma L.
27

9

mentioned that MOLINA and PLAZA had a lawyer draw up the "paper's" Stephanie
LOCKER had requested.   Upon being shown the messages, Stephanie LOCKER
admitted to planning to fraudulently identify SSGT LOCKER as being the biological
father of Emma L.  However, Stephanie LOCKER denied following through with the
plan because she was unable to come up with a scenario that would have placed SSGT
LOCKER and MOLINA in the same location at the same time to prove conception.  SA
BERG also showed Stephanie LOCKER messages from August 24, 2014, that
memorialized how Stephanie LOCKER continued to develop other fraudulent ways to
adopt Emma L. Stephanie LOCKER reviewed the messages SA BERG presented to her
and admitted that she planned to list herself as the biological mother on Emma L.'s birth
certificate.  Stephanie LOCKER also admitted that in the messages she discussed how to
obtain paperwork and records that would support the fraudulent birth certificate.

21.    On or about May 24, 2016, NCIS SA Brian BERTNIK interviewed John
DOMINGO at his residence in Bend, Oregon.  DOMINGO advised he worked as the
Principal Officer of the U.S. Consular Agency in Cebu, Philippines, for twenty years
until his recent retirement.   During his 20-year career, DOMINGO processed
approximately 4,000 to 6,000 Consular Report of Birth Abroad ("CRBA") applications
and another 20,000 to 25,000 Passport Applications. DOMINGO advised that during his
career he identified between 12 and 15 people who filed fraudulent CRBA applications.

22.    DOMINGO stated on or about October 14, 2014, his employee, Rey
DELOS-REYES, came to him and told him Stephanie LOCKER was attempting to
obtain a CRBA and U.S. Passport for a child whom she was calling Emma Loralee
LOCKER (Emma L.).  DOMINGO told agents that DELOS-REYES informed him that
Stephanie LOCKER claimed that she had come to the Philippines to visit friends, not
realizing she was pregnant, and ended up having the baby in the Philippines.
DOMINGO then met with Stephanie LOCKER, who was only accompanied by the
baby.  DOMINGO described Stephanie LOCKER as a white female, 5'1" tall, and over

200 pounds. According to DOMINGO, Stephanie LOCKER's weight appeared to be something she had carried for a long time and did not appear to be weight gained during pregnancy. DOMINGO stated he explained the CRBA and Passport applications to Stephanie LOCKER and provided her with a checklist of required items she needed to obtain a CRBA and U.S. Passport. These items included: Stephanie LOCKER's and her husband's U.S. Passports; hospital records for the baby; photograph of the child and the presence of the child to verify the photograph; birth certificate (either from the Philippines Providential Government or the Philippines National Statistics Office (NSO)); and Stephanie LOCKER's pre-natal hospital records. Stephanie LOCKER lacked all records except the photograph and her U.S. Passport. DOMINGO told agents that Stephanie LOCKER provided him with a sheet of paper with handwritten information on it, which read in substance that the birthing clinic that delivered the baby provided it to her as a birth certificate. DOMINGO advised neither the U.S. Consular Agency nor the U.S. Embassy in Manila would accept the paper as a birth certificate.

23. During DOMINGO's exchange with Stephanie LOCKER, she had the baby strapped face first to her chest and DOMINGO could see very little of the baby. DOMINGO told agents that he asked to look at the baby and Stephanie LOCKER seemed "put off" by the request. DOMINGO informed agents that Stephanie LOCKER was in a hurry and kept wanting to expedite the process. DOMINGO explained to Stephanie LOCKER that he had to see the child to compare the photograph with the actual child. DOMINGO told Stephanie LOCKER that he needed to see all of the baby's face and stated it would be best if Stephanie LOCKER removed the child from the carrier and showed her to him; Stephanie LOCKER refused. DOMINGO told agents that Stephanie LOCKER loosened the carrier more and turned sideways so he could see all of the baby's face, excluding one ear. DOMINGO told the agents that the baby had a much darker complexion than the photograph Stephanie LOCKER had presented to DOMINGO. DOMINGO told the agents that the photograph appeared to have been

1  "photo shopped" to make the skin color of the baby appear much lighter than the baby's
2  actual complexion.  DOMINGO also informed agents that the baby appeared to have
3  completely Asian features, unlike Stephanie LOCKER, who was obviously Caucasian.
4  DOMINGO also advised the baby appeared to be two to three months old, not premature
5  like Stephanie LOCKER had stated.  DOMINGO told agents that he asked Stephanie
6  LOCKER how she could account for the dark skin and Asian features of the child.
7  Stephanie LOCKER stated SSGT LOCKER was a Native American and had dark skin.

8      24.     DOMINGO told agents that, at that point, he told Stephanie LOCKER,
9  "Please be aware that if you attempt to obtain citizenship for the baby through fraudulent
10 means," you could be prosecuted.  DOMINGO advised he explained the adoption
11 process to Stephanie LOCKER and she did not appear to care.  DOMINGO advised
12 Stephanie LOCKER portrayed a demeanor that she did not care what she had to do, all
13 she wanted to do was get the baby to Japan.  DOMINGO informed agents that his
14 conversation with Stephanie LOCKER left no doubt with Stephanie LOCKER that, if
15 she went forward with a fraudulent application for CRBA or Passport, she could be
16 prosecuted.  At no time did DOMINGO advise Stephanie LOCKER that the only thing
17 that could happen as a result of filing fraudulent documents was that she would not be
18 able to keep the baby. DOMINGO informed Stephanie LOCKER that it was a State
19 Department policy that if there was suspicion that a child was not the biological child of
20 a parent applying for CRBA, a DNA test would need to be completed.  DOMINGO told
21 agents that Stephanie LOCKER did not appear shocked that it could take up to six
22 months for the paperwork to be completed for the CRBA and Passport.  DOMINGO
23 opined to agents that he believed Stephanie LOCKER was not shocked at the six-month
24 time period because Stephanie LOCKER knew that the DNA tests would show that she
25 was not the mother of the child.

26     25.     DOMINGO told agents that during the whole interaction with Stephanie
27 LOCKER, he followed the U.S. Consular Agency rules and regulations.  DOMINGO

1  advised he used the same form he provided Stephanie LOCKER to show what
2  documents she would need to apply for CRBA and a U.S. Passport. DOMINGO advised
3  he could not stop Stephanie LOCKER from applying for CRBA or a U.S. Passport, but
4  he did his best to talk Stephanie LOCKER out of doing so because he believed she was
5  doing so fraudulently. DOMINGO told agents that when he failed to talk her out of it,
6  he swore Stephanie LOCKER to all of the required forms by having her raise her right
7  hand and swear that all of the documents she filed were true to the best of her
8  knowledge. Stephanie LOCKER swore that all documents were true. DOMINGO
9  advised he then took all of the forms and sent them to the U.S. Embassy in Manila.
10  DOMINGO advised that he then sent an email to Amy REARDON at the U.S. Embassy
11  relaying his suspicions.

12      26.    There is probable cause to support the belief that the target individuals
13  committed criminal offenses by falsely representing that they were Emma L.'s biological
14  parents. Specifically, Stephanie LOCKER provided false documents and attested, under
15  oath, that she went to the Philippines for vacation unaware that she was pregnant and
16  gave birth five days later to Emma L. Stephanie LOCKER has repeatedly claimed that
17  she is Emma L.'s biological mother. However, the evidence gathered overwhelmingly
18  supports that Stephanie LOCKER, with the assistance of her husband, SSGT LOCKER,
19  and others, received Emma L. from Emma L.'s Filipina biological mother (not through a
20  lawful adoption), and neither Stephanie LOCKER nor SSGT LOCKER has any blood
21  relation to Emma L. Furthermore, with the assistance of others, Stephanie LOCKER
22  developed a plan to pass off Emma L. as her own child by participating in the altering of
23  Emma L.'s Filipino birth registration; presenting the fraudulent document to the U.S.
24  Embassy in Cebu, Philippines; fraudulently representing that Emma L. was her
25  biological daughter; and thereafter, swore under oath and in writing that she was Emma
26  L.'s biological mother, all in effort to secure U.S. citizenship documents for Emma L. so
27  Stephanie LOCKER could take Emma L. from the Philippines to Japan as her own child.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

27.     As mentioned above, the United States has previously obtained information from Stephanie LOCKER's Facebook account ("Target Account") through a permissive authorization for search and seizure form that Stephanie LOCKER signed.  The United States is requesting data directly from Facebook to ensure that all of the data, including possibly deleted data from July 2014 to April 2015, is provided, and that chain of custody of the data is preserved for evidentiary purposes.

28.     On October 21, 2016, NCIS sent a preservation request to Facebook via the Law Enforcement Online Request portal, in reference to the Target Account.

## FACEBOOK, INC.

29.     Facebook, Inc. is an Internet company which, among other things, provides electronic communication services to its subscribers. Facebook's electronic mail/communication service allows Facebook subscribers to communicate and share with other Facebook subscribers and with others through the Internet. Facebook subscribers access Facebook's services through the Internet.

30.     Subscribers to Facebook use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Facebook requires users to subscribe for a free Facebook account, Facebook does not verify the information provided by the Facebook subscriber for its free services.

31.     At the creation of a Facebook account and for each subsequent access to the account, Facebook logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its

1  customer. Subscriber information for that customer then can be obtained using
2  appropriate legal process.

3   32.  Facebook owns and operates a free-access social networking website of the
4  same name that can be accessed at http://www.facebook.com. Facebook allows its users
5  to establish accounts with Facebook, and users can then use their accounts to share
6  written news, photographs, videos, and other information with other Facebook users, and
7  sometimes with the general public.

8   33.  Facebook asks users to provide basic contact and personal identifying
9  information to Facebook, either during the registration process or thereafter. This
10 information may include the user's full name, birth date, gender, contact e-mail
11 addresses, Facebook passwords, Facebook security questions and answers (for password
12 retrieval), physical address (including city, state, and zip code), telephone numbers,
13 screen names, websites, and other personal identifiers.  Facebook also assigns a user
14 identification number to each account.

15  34.  Facebook users may join one or more groups or networks to connect and
16 interact with other users who are members of the same group or network.  Facebook
17 assigns a group identification number to each group. A Facebook user can also connect
18 directly with individual Facebook users by sending each user a "Friend Request."  If the
19 recipient of a "Friend Request" accepts the request, then the two users will become
20 "Friends" for purposes of Facebook and can exchange communications or view
21 information about each other. Each Facebook user's account includes a list of that user's
22 "Friends" and a "News Feed," which highlights information about the user's "Friends,"
23 such as profile changes, upcoming events, and birthdays.

24  35.  Facebook users can select different levels of privacy for the
25 communications and information associated with their Facebook accounts. By adjusting
26 these privacy settings, a Facebook user can make information available only to himself
27

1    or herself, to particular Facebook users, or to anyone with access to the Internet,

2    including people who are not Facebook users. A Facebook user can also create "lists" of

3    Facebook friends to facilitate the application of these privacy settings. Facebook

4    accounts also include other account settings that users can adjust to control, for example,

5    the types of notifications they receive from Facebook.

6        36.    Facebook users can create profiles that include photographs, lists of

7    personal interests, and other information. Facebook users can also post "status" updates

8    about their whereabouts and actions, as well as links to videos, photographs, articles, and

9    other items available elsewhere on the Internet.   Facebook users can also post

10   information about upcoming "events," such as social occasions, by listing the event's

11   time, location, host, and guest list. In addition, Facebook users can "check in" to

12   particular locations or add their geographic locations to their Facebook posts, thereby

13   revealing their geographic locations at particular dates and times. A particular user's

14   profile page also includes a "Wall," which is a space where the user and his or her

15   "Friends" can post messages, attachments, and links that will typically be visible to

16   anyone who can view the user's profile.

17       37.    Facebook allows users to upload photos and videos, which may include any

18   metadata such as location that the user transmitted when s/he uploaded the photo or

19   video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a

20   photo or video. When a user is tagged in a photo or video, he or she receives a

21   notification of the tag and a link to see the photo or video. For Facebook's purposes, the

22   photos and videos associated with a user's account will include all photos and videos

23   uploaded by that user that have not been deleted, as well as all photos and videos

24   uploaded by any user that have that user tagged in them.

25       38.    Facebook users can exchange private messages on Facebook with other

26   users. These messages, which are similar to e-mail messages, are sent to the recipient's

27   "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well

as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

39.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

40.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

41.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

42.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

43.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

44.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send

1  each other "pokes," which are free and simply result in a notification to the recipient that
2  he or she has been "poked" by the sender.

3       45.    Facebook also has a Marketplace feature, which allows users to post free
4  classified ads.   Users can post items for sale, housing, jobs, and other items on the
5  Marketplace.

6       46.    In addition to the applications described above, Facebook also provides its
7  users with access to thousands of other applications ("apps") on the Facebook platform.
8  When a Facebook user accesses or uses one of these applications, an update about that
9  the user's access or use of that application may appear on the user's profile page.

10      47.    Facebook uses the term "Neoprint" to describe an expanded view of a given
11 user profile.   The "Neoprint" for a given user can include the following information
12 from the user's profile:   profile contact information; News Feed information; status
13 updates; links to videos, photographs, articles, and other items; Notes; Wall postings;
14 friend lists, including the friends' Facebook user identification numbers; groups and
15 networks of which the user is a member, including the groups' Facebook group
16 identification numbers; future and past event postings; rejected "Friend" requests;
17 comments; gifts; pokes; tags; and information about the user's access and use of
18 Facebook applications.

19      48.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP
20 address.   These logs may contain information about the actions taken by the user ID or
21 IP address on Facebook, including information about the type of action, the date and
22 time of the action, and the user ID and IP address associated with the action. For
23 example, if a user views a Facebook profile, that user's IP log would reflect the fact that
24 the user viewed the profile, and would show when and from what IP address the user did
25 so.

26      49.    Social networking providers like Facebook typically retain additional
27 information about their users' accounts, such as information about the length of service

1  (including start date), the types of service utilized, and the means and source of any

2  payments associated with the service (including any credit card or bank account

3  number). In some cases, Facebook users may communicate directly with Facebook

4  about issues relating to their accounts, such as technical problems, billing inquiries, or

5  complaints from other users. Social networking providers like Facebook typically retain

6  records about such communications, including records of contacts between the user and

7  the provider's support services, as well as records of any actions taken by the provider or

8  user as a result of the communications.

9       50.  As explained herein, information stored in connection with a Facebook

10  account may provide crucial evidence of the "who, what, why, when, where, and how"

11  of the criminal conduct under investigation, thus enabling the United States to establish

12  and prove each element or alternatively, to exclude the innocent from further suspicion.

13  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic

14  communications, and other data retained by Facebook, can indicate who has used or

15  controlled the Facebook account. This "user attribution" evidence is analogous to the

16  search for "indicia of occupancy" while executing a search warrant at a residence. For

17  example, profile contact information, private messaging logs, status updates, and tagged

18  photos (and the data associated with the foregoing, such as date and time) may be

19  evidence of who used or controlled the Facebook account at a relevant time. Further,

20  Facebook account activity can show how and when the account was accessed or used.

21  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses

22  from which users access their accounts along with the time and date. By determining the

23  physical location associated with the logged IP addresses, investigators can understand

24  the chronological and geographic context of the account access and use relating to the

25  crime under investigation.  Such information allows investigators to understand the

26  geographic and chronological context of Facebook access, use, and events relating to the

27  crime under investigation. Additionally, Facebook builds geo-location into some of its

1   services.  Geo-location allows, for example, users to "tag" their location in posts and

2   Facebook "friends" to locate each other. This geographic and timeline information may

3   tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook

4   account activity may provide relevant insight into the Facebook account owner's state of

5   mind as it relates to the offense under investigation. For example, information on the

6   Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

7   information indicating a plan to commit a crime), or consciousness of guilt (e.g.,

8   deleting account information in an effort to conceal evidence from law enforcement).

9      51.    Therefore, the computers of Facebook are likely to contain all the material

10   described  above,  including  stored  electronic  communications  and  information

11   concerning subscribers and their use of Facebook, such as account access information,

12   transaction information, and other account information.

13           **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

14      52.    Federal  agents  and  investigative  support  personnel  are  trained  and

15   experienced in identifying communications relevant to the crimes under investigation.

16   The personnel of Facebook are not. It would be inappropriate and impractical for federal

17   agents to search the vast computer network of Facebook for the relevant accounts and

18   then to analyze the contents of those accounts on the premises of Facebook. The impact

19   on Facebook's business would be severe.

20      53.    Therefore, I request authority to seize all content, including profile contact

21   information, mini-feed, status update history, shares, notes, wall postings, friend listing

22   with friend's Facebook ID, group listing with Facebook Group ID, future and past

23   events, and video listings with filename; User Photos (referred to as User Photoprint);

24   Geo-tags; Group Information; Private Messages; IP Logs; and any other content from

25   the Facebook accounts, as described in Attachment B. In order to accomplish the

26   objective of the search warrant with a minimum of interference with the business

27   activities of Facebook, to protect the rights of the subject of the investigation and to

effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

54.     Analyzing the data to be provided by Facebook requires special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

55.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

56.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails

1  sent or received in temporal proximity to incriminating electronic mails that provide

2  context to the incriminating mails.

3      57.    All forensic analysis of the imaged data will employ search protocols

4  directed exclusively to the identification and extraction of data within the scope of this

5  warrant.

6      **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

7      58.    I anticipate executing this warrant under the Electronic Communications

8  Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

9  using the warrant to require Facebook to disclose to the government copies of the

10  records and other information (including the content of communications) particularly

11  described in Section I of Attachment B.  Upon receipt of the information described in

12  Section I of Attachment B, government-authorized persons will review that information

13  to locate the items described in Section II of Attachment B.

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

## **CONCLUSION**

59.     Based on the foregoing, I submit that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1542, and that the foregoing will be found on the premises searched, as identified in Attachment A.

Respectfully submitted,

Amanda L. Hawes
Special Agent
NCIS

Subscribed and sworn to before me on ___DEC. 20___, 2016

ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE